810 F.2d 153
 Robin Ann BEAR, et al., Appellants/Cross-appellees,
v.
UNITED STATES of America, et al., Appellees (Two Cases).
The WINNEBAGO TRIBE OF NEBRASKA, Appellant/Cross-appellee,
v.
UNITED STATES of America, Appellee,
The State of Iowa, Appellee/Cross-appellant.
 Nos. 85-2485, 2487NE.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 13, 1986.
Decided Jan. 21, 1987.
 
 1
 Dale T. White of Boulder, Colo., for appellants/cross-appellees.
 
 
 2
 Sarah P. Robinson of the Dept. of Justice in Washington, D.C., John P. Sarcone, Asst. Atty. Gen., Des Moines, Iowa, for appellees.
 
 
 3
 Before LAY, Chief Judge, FAGG, Circuit Judge, and LARSON, Senior District Judge.*
 
 
 4
 LARSON, Senior District Judge.
 
 
 5
 The Winnebago Tribe of Nebraska and several heirs of individual Indian allottees brought suit to quiet title to accreted lands located in Nebraska and Iowa along the Missouri River. All of the land sought by the Tribe and much of the land sought by the heirs of the individual allottees was subject to condemnation proceedings by the United States in the 1970s, and is currently held by the United States. The remainder of the land sought by the heirs is held by two private parties: Briar Cliff College and Sinsinawa Dominican Congregation of the Most Holy Rosary.
 
 
 6
 The district court granted summary judgment against the Tribe and the heirs, holding that their actions were barred by the doctrine of res judicata as a result of the earlier condemnation proceedings, and further that the heirs' claims were barred by conveyance of the original allotments in 1927 and 1928. Bear v. United States, 611 F.Supp. 589, 595, 602 (D.Neb.1985). Both the Tribe and the heirs have appealed to this Court.
 
 
 7
 We believe that the individuals transferred away any claims to the accretions which they might have had and find that despite a void settlement between the Tribe and its co-defendant the State of Iowa in the prior condemnation proceeding, the Tribe's claims against the United States in this action are barred by the doctrine of res judicata. Accordingly, we affirm the district court's dismissal of all of plaintiffs' claims.
 
 1. The Individual Allottees' Claims
 
 8
 The individual Indian plaintiffs are the heirs of two Indians, Reuben DeCora and Mrs. Jackson, who received 40 and 39.50 acre allotments from the federal government in 1872. The 40 acre DeCora allotment originally was not riparian to the Missouri River, but it became so between 1872 and 1906 while DeCora still held the allotment. The 39.50 Jackson allotment was only partially riparian in 1872. Like the DeCora allotment, however, the Jackson allotment became fully riparian by 1906. Lands accreted to both tracts as the river gradually receded between 1875 and 1923.
 
 
 9
 Some time thereafter, both DeCora and Jackson died, and their heirs received trust patents for their allotments. In both cases, the heirs petitioned the United States to sell the allotments, and Thomas Ashford bid on and purchased both parcels. The General Land Office issued fee patents to Ashford for the DeCora allotment on November 1, 1927, and for the Jackson allotment on March 31, 1928.
 
 
 10
 The current heirs agree the original allotments were conveyed to Ashford in 1927 and 1928, but claim the accreted land was not. The deeds to Ashford contain no exception for the accretions, however, and the district court applied the "well-established principle that accretions ordinarily pass upon a conveyance of a parcel of real estate absent a specific reservation of title." 611 F.Supp. at 595. The court thus found as a matter of law that the accreted lands passed to Ashford and that the heirs had no claim to those lands.
 
 
 11
 The heirs argue on appeal that the rule relied upon by the district court applies only where the deed or patent conveying the property refers to the land "as shown by the official government survey" and the parcel is shown as being riparian according to that survey. We do not agree that the rule is so limited. Courts have recognized the doctrine in all instances of riparian land, including situations where non-riparian land has become riparian over time. See, e.g., Bone v. May, 208 Iowa 1094, 225 N.W. 367, 368-69 (1929); Worm v. Crowell, 165 Neb. 713, 87 N.W.2d 384, 389-90 (1958). See also III American Law of Property, § 15.27 at 857-58 (1952 & Supp.1977). This is most consistent with the rationale behind the rule, namely, that when land conveyed is bounded by water "it may well be regarded as the expectancy of both grantor and grantee that it should continue to be so bounded," so that the owner "will not be shut off from the water." III American Law of Property, supra, § 15.27 at 857, 859 (footnotes omitted). "Public policy established by custom practically from the inception of the common law is therefore the basis of this law." Id. at 859 (footnote omitted).
 
 
 12
 The Supreme Court has recognized the universal acceptance of this rule, noting differences only in the descriptions of the rule's rationale:
 
 
 13
 By some, the rule has been vindicated on the principle of natural justice, that he who sustains the burden of losses and of repairs, imposed by the continguity of waters, ought to receive whatever benefits they may bring by accretion; by others it is derived from the principle of public policy, that it is the interest of the community that all land should have an owner, and most convenient that insensible additions to the shore should follow the title to the shore itself.
 
 
 14
 Jefferis v. East Omaha Land Co., 134 U.S. 178, 189, 10 S.Ct. 518, 520, 33 L.Ed. 872 (1890) (citation omitted). See Hughes v. Washington, 389 U.S. 290, 293-94, 88 S.Ct. 438, 440-41, 19 L.Ed.2d 530 (1967); DeBoer v. United States, 653 F.2d 1313, 1315 (9th Cir.1981).
 
 
 15
 Thus, the authorities have consistently maintained that accretions must be expressly excluded from a conveyance to avoid their transfer. See III American Law of Property, supra, § 15.27 at 859; Wemmer v. Young, 167 Neb. 495, 93 N.W.2d 837, 851 (1958); Worm v. Crowell, supra, 87 N.W.2d at 390. This Court has previously held that alloted lands are treated no differently. Fontenelle v. Omaha Tribe, 430 F.2d 143, 147 (8th Cir.1970). Because the accretions to the DeCora and Jackson allotments were not exempted from the conveyances to Ashford in this case, Ashford received title to the accretions as well as to the original allotments and the heirs have no valid claim to any of these lands.
 
 
 16
 The heirs argue that the "substantial accretion" rule changes this result, but we do not agree. The "substantial accretion" rule has been applied in situations where the government has granted a patent to land which had been surveyed long before entry on the land and which, unknown to the government, had benefited from the addition of substantial accretions where the purchaser would be unjustly enriched by ownership of the accretions. DeBoer v. United States, 653 F.2d 1313, 1315-16 (9th Cir.1981); Smith v. United States, 593 F.2d 982, 984-88 (10th Cir.1979). Assuming the heirs of individual allottees could stand in the same shoes as the government, there is no evidence that the heirs who conveyed the allotments were unaware of the accretions. In fact, the accretions formed while the original allottees were in possession of the land and before its transfer to Ashford. The heirs who actually sold the property were also in possession and had been renting the land prior to its sale.
 
 
 17
 Moreover, while the heirs characterize Ashford's payments of $1203 for the Jackson allotment and $1500 for the DeCora allotment as compensation for the original allotments only, there is no evidence of unjust enrichment. A similar tract with accretions of 520 acres sold for only slightly more money than the DeCora and Jackson allotments ($1600), yet the DeCora and Jackson accretions were smaller in size: 200 and 300 acres respectively.
 
 
 18
 Thus, we believe the district court correctly held that the individual allottees heirs' claims should be dismissed on the ground that the conveyances to Ashford in 1927 and 1928 included the accreted land along with the original allotments.[1]
 
 2. The Tribe's Claims
 
 19
 The Tribe's claims to accreted lands involve consideration of a different set of circumstances. All of the land claimed by the Tribe was the subject of condemnation proceedings initiated by the United States in 1970, in which the Tribe and the State of Iowa, among others, were defendants. The Tribe claimed ownership of the land as accretions to the Winnebago Reservation, just as it seeks to do in this action. The State claimed ownership to the same land under its sovereign doctrine of state ownership of the bed and banks of navigable streams.
 
 
 20
 Prior to the hearing on the issues of ownership and just compensation,[2] the Tribe and the State entered into a stipulation "to effect a settlement of their respective property rights ... and to avoid the expense and inconvenience entailed in litigating said title disputes" in which the Tribe relinquished its alleged right to the lands at issue in exchange for a parcel of real estate from Iowa known as Omadi Bend, or alternatively, for $45,000. The stipulation was signed by attorneys for the Tribe and the State.
 
 
 21
 After the stipulation was executed, the condemnation action proceeded, and after hearing, the district court held that the State of Iowa owned the land. The United States was subsequently awarded title to the land through the court's condemnation judgment, and Iowa received just compensation for the land from the United States. The court's judgment specifically provided:
 
 
 22
 IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all defendants, known or unknown, named and designated in the Complaint filed herein, other than the parties to whom compensation is specifically awarded herein, are forever barred and excluded from asserting any right, title, interest or estate in, lien upon, or claim against, the estate taken in said tract.
 
 
 23
 No appeal was taken by the Tribe.
 
 
 24
 The Tribe argued before the district court that the stipulation between the Tribe and the State was void because it conveyed a claim to Indian lands and was not approved as required by federal law. The Tribe further argued that this fact should render the subsequent judgment awarding title to the United States void. The district court agreed with the Tribe that the stipulation between the State and the Tribe as defendants was invalid, but nonetheless found that the doctrine of res judicata precluded the Tribe's challenge to the plaintiff United States' title to the accreted lands.
 
 
 25
 On appeal to this Court, the Tribe urges that the district court erred in failing to invalidate the condemnation judgment obtained by the United States because of the void stipulation between the Tribe and its co-defendant. We agree with the district court, however, that the condemnation judgment bars the Tribe's action against the United States in this case.
 
 
 26
 The Supreme Court has expressly stated that the policies advanced by the doctrine of res judicata "are at their zenith in cases concerning real property, land and water." Nevada v. United States, 463 U.S. 110, 129 n. 10, 103 S.Ct. 2906, 2918 n. 10, 77 L.Ed.2d 509 (1983) (citations omitted). This Court has found the same. Oglala Sioux Tribe v. Homestake Mining Co., 722 F.2d 1407, 1409 (8th Cir.1983). The doctrine of res judicata provides that a "final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Federated Department Stores, Inc. v. Moitie, 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103 (1981).
 
 
 27
 Indian land claims are not entitled to a special exemption from res judicata principles, Mashpee Tribe v. Watt, 707 F.2d 23, 24 (1st Cir.), cert denied, 464 U.S. 1020, 104 S.Ct. 555, 78 L.Ed.2d 728 (1983), see Oglala Sioux Tribe v. Homestake Mining Co., supra, 722 F.2d at 1409-11, and the Tribe does not dispute that the parties and issues in this suit are identical to those in the prior condemnation proceeding. The Tribe had the opportunity to present its claims regarding ownership of the land and the United States' authority to condemn such land, and a final judgment on the merits was entered in favor of the United States.
 
 
 28
 Thus, the requirements of res judicata are undeniably met. See Arizona v. California, 460 U.S. 605, 617, 103 S.Ct. 1382, 1390, 75 L.Ed.2d 318 (1983); Federated Department Stores, Inc. v. Moitie, supra, 452 U.S. at 399, 101 S.Ct. at 2428. The Tribe nonetheless suggests that we create an exception to the res judicata doctrine in this case because to apply the doctrine, according to the Tribe, would thwart the statutory scheme regarding conveyances of Indian land--requiring approval by a federal official, not obtained in this case--and would undermine this Court's subsequent decision in United States v. Winnebago Tribe, 542 F.2d 1002 (8th Cir.1976), upholding the Tribe's position concerning the government's lack of authority to condemn tribal treaty lands absent express Congressional authorization. This argument is tantamount to suggesting that res judicata not be applied when it is later discovered that an error or mistake has been made, however, an argument which the Supreme Court has soundly rejected.
 
 
 29
 In Federated Department Stores, Inc. v. Moitie, for example, the Court stated:
 
 
 30
 Nor are the res judicata consequences of a final, unappealed judgment on the merits altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case.... We have observed that "[t]he indulgence of a contrary view would result in creating elements of uncertainty and confusion and in undermining the conclusive character of judgments, consequences which it was the very purpose of the doctrine of res judicata to avert."
 
 
 31
 452 U.S. at 398-99, 101 S.Ct. at 2428 (citations omitted). The Moitie Court thus concluded: "There is simply no principle of law or equity which sanctions rejection by a federal court of the salutary principle of res judicata." Id. at 401, 101 S.Ct. at 2429 (citation omitted).
 
 
 32
 The Court has applied these principles to Indian claims to land and water rights as well. In Arizona v. California, 460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983), the Court refused to reconsider a claim by the Fort Mojave, Chemehuevi, and Quechan Indian Tribes that certain practicably irrigable acreage was mistakenly omitted from a prior decree concerning water rights in the Colorado River, despite a provision in the decree which provided for its modification. Id. at 617-18, 103 S.Ct. at 1390-91. The Court stated:
 
 
 33
 There is no question that if these claims were presented in a different proceeding, a court would be without power to reopen the matter due to the operation of res judicata.
 
 
 34
 Id. at 617, 103 S.Ct. at 1390. The Court then interpreted the modification provision in the pending decree narrowly, refusing to consider the Tribes' request to modify it because:
 
 
 35
 "To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." Montana v. United States, supra, [440 U.S. 147] at 153-154, [99 S.Ct. 970, 973-74, 59 L.Ed.2d 210].
 
 
 36
 In no context is this more true than with respect to rights in real property. Abraham Lincoln once described with scorn those who sat in the basements of courthouses combing property records to upset established titles. Our reports are replete with reaffirmations that questions affecting titles to land, once decided, should no longer be considered open.
 
 
 37
 Id. at 619-20, 103 S.Ct. at 1391-92 (footnote and citations omitted). Based upon these principles, it is clear that the Tribe's request for an exception to the application of the doctrine of res judicata in this case must be rejected.
 
 
 38
 Alternatively, the Tribe urges that it be allowed to reopen the issues determined in the condemnation judgment because its unauthorized settlement with its co-defendant, the State of Iowa, rendered the entire judgment void. In support of its argument, the Tribe cites United States v. Beebe, 180 U.S. 343, 21 S.Ct. 371, 45 L.Ed. 563 (1901), in which the United States was permitted to collaterally attack the validity of judgments which embodied "a compromise made by the district attorney which he had no power to enter into, and which rendered the judgments so far unauthorized as to permit a suit to set them aside." Id. at 351, 21 S.Ct. at 374. See also United States v. 32.40 Acres, 614 F.2d 108, 113-14 (6th Cir.1980).
 
 
 39
 The Tribe argues that its counsel's actions were identical to those at issue in Beebe and 32.40 Acres,[3] because its settlement with its co-defendant the State of Iowa, while the litigation decision of the Tribe, was not submitted for approval to the appropriate government official. The stipulation in this case was not, however, in any way embodied in the final judgment in favor of the United States as was true in both Beebe and 32.40 Acres. The United States as a party plaintiff in fact had no involvement in the agreement and had no interest in the outcome of the ownership dispute between the Tribe and the State: it simply sought to pay just compensation to the true owner. The invalidity of the settlement between the State and the Tribe thus in no way precludes the United States from asserting the doctrine of res judicata as a bar to the Tribe's current challenge to its title.
 
 
 40
 Any other result we believe would run contrary to the policies of finality--particularly as they relate to title to land--which are at the foundation of the res judicata doctrine. In the words of the Supreme Court:
 
 
 41
 We have stressed that "[the] doctrine of res judicata is not a mere matter of practice or procedure inherited from a more technical time than ours. It is a rule of fundamental and substantial justice, 'of public policy and of private peace,' which should be cordially regarded and enforced by our courts ..."
 
 
 42
 Federated Department Stores, Inc. v. Moitie, supra, 452 U.S. at 401, 101 S.Ct. at 2429 (citation omitted).
 
 
 43
 "Where questions arise which affect titles to land it is of great importance to the public that when they are once decided they should no longer be considered open. Such decisions become rules of property, and many titles may be injuriously affected by their change.... Doubtful questions on subjects of this nature, when once decided, should be considered no longer doubtful or subject to change."
 
 
 44
 Nevada v. United States, supra, 463 U.S. at 129 n. 10, 103 S.Ct. at 2918 n. 10 (citing Minnesota Co. v. National Co., 3 Wall. 332, 334, 18 L.Ed. 42 (1866)). The district court correctly determined that the res judicata doctrine barred the Tribe's claims against the United States in this case.
 
 
 45
 For all of the foregoing reasons, the judgment of the district court dismissing plaintiffs' claims in their entirety is affirmed.
 
 
 
 *
 The Honorable Earl R. Larson, Senior United States District Judge for the district of Minnesota, sitting by designation
 
 
 [1]
 Because of this holding, we need not consider whether, as the district court also ruled, the doctrine of res judicata bars the heirs' claims to portions of the accretions which were condemned by the United States in the 1970s. Nor need we address the alternative basis for affirming the district court's decision advanced by the United States on appeal, namely, that the statute of limitations under the Quiet Title Act had run
 
 
 [2]
 The Tribe initially challenged the government's authority to condemn any alleged tribal land absent express Congressional authorization. The district court ruled against the Tribe on this issue, and the Tribe's appeal to this Court was denied on the grounds that there was no final judgment. United States v. 687.30 Acres of Land, 451 F.2d 667 (8th Cir.1971), cert. denied, 405 U.S. 1026, 92 S.Ct. 1291, 31 L.Ed.2d 486 (1972)
 This Court later held--in a completely separate action--that express Congressional authorization was required to abrogate treaty rights to tribal lands through condemnation. United States v. Winnebago Tribe, 542 F.2d 1002, 1005-06 (8th Cir.1976). The Tribe had clearly established its title to the lands at issue in this separate proceeding, and a final judgment in favor of the United States had been entered by the district court. See id. at 1004.
 
 
 [3]
 The Tribe ordinarily is represented by United States attorneys, although in this case, because of the United States' presence as a party plaintiff, the Tribe obtained independent counsel